# EXHIBIT 4D

Page 1

CAUSE NO. 2010-27354

| | |
|---|---|
| WELLS FARGO BANK, N.A., AS) | IN THE DISTRICT COURT OF |
| TRUSTEE FOR OPTION ONE ) | |
| MORTGAGE LOAN TRUST ) | |
| 2007-FXD1, ASSET-BACKED ) | |
| CERTIFICATES, SERIES ) | |
| 2007-FXD1, BY ITS ) | |
| SERVICER-IN-FACT, ) | |
| SPECIALIZED LOAN ) | |
| SERVICING, LLC, ) | |
|    Plaintiff, ) | |
| ) | |
| VS. ) | 270TH JUDICIAL DISTRICT |
| ) | |
| BOULEVARD PROPERTIES ) | |
| CORPORATION, DANIEL DROR, ) | |
| II, DANIEL DROR, AND ) | |
| GABRIELA KRKOSKOVA DROR, ) | |
|    Defendants. ) | HARRIS COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL AND VIDEOTAPED DEPOSITION OF DANIEL DROR
SEPTEMBER 6, 2012
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    ORAL AND VIDEOTAPED DEPOSITION of DANIEL DROR, produced as a witness at the instance of the Plaintiff/Counter-Defendant Wells Fargo, Trustee, and duly sworn, was taken in the above-styled and numbered cause on the 6th day of September, 2012, from 9:14 a.m. to 3:42 p.m., before Yvette Perrodin, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Hughes, Watters, Askanase, L.L.P., Three Allen Center, 333 Clay, 29th Floor, Houston, Texas, pursuant to the Texas Rules of Civil Procedure and the stipulations of counsel as set out herein or attached hereto.

Oral Deposition of Daniel Dror

### Page 2

```
 1           APPEARANCES
 2
 3   FOR THE PLAINTIFFS:
       Mr. C. Ed Harrell
 4     HUGHES, WATTERS, ASKANASE, L.L.P.
       Three Allen Center
 5     333 Clay, 29th Floor
       Houston, Texas 77002
 6     Phone: (713) 759-0818
       Fax:   (713) 759-6834
 7
 8   FOR THE DEFENDANT DANIEL DROR II, DANIEL DROR AND
     GABRIELA KRKOSKOVA DROR:
 9     Mr. Neal D. Cannon, Jr.
       NEAL CANNON & ASSOCIATES, P.C.
10     921A Heights Boulevard
       Houston, Texas 77008
11     Phone: (713) 260-3900
       Fax:   (713) 260-3902
12
13   FOR THE DEFENDANT BOULEVARD PROPERTIES CORPORATION:
       Mr. Leonard H. Simon
14     PENDERGRAFT & SIMON
       2777 Allen Parkway, Suite 800
15     Houston, Texas 77019
       Phone: (713) 528-8555
16     Fax:   (832) 202-2810
17
     ALSO PRESENT:
18     Ms. Kayla Barnes - Videographer
       Mr. Kathy Conn
19     Mr. Daniel Dror, II
20
21
22
23
24
25
```

### Page 3

```
 1                  INDEX
 2                                    PAGE
 3   Stipulations                       1
 4   Appearances                        2
 5
 6   DANIEL DROR
 7       Examination by Mr. Harrell     4
 8       Examination by Mr. Cannon    218
 9       Further Examination by Mr. Harrell  222
10
11   Signature and Changes             225
12   Reporter's Certificate            227
13
14               EXHIBITS
15   NO.  DESCRIPTION                 PAGE
16   87   Special Warranty Deed        41
17   88   Deed of Trust                58
18   89   Deed of Trust                67
19   90   Title Documents              81
20   91   Real Estate Lien Note       117
21   92   Option One Statement        196
22   93   Deed of Trust               201
23   94   Texas Franchise Tax Information Report  202
24   95   Deed of Trust               204
25   96   Fourth Amended Notice of Deposition  210
```

### Page 4

```
 1        THE VIDEOGRAPHER: On the record at
 2   9:14 a.m., beginning Tape 1.
 3        DANIEL DROR,
 4   having been first duly sworn, testified as follows:
 5             EXAMINATION
 6   BY MR. HARRELL:
 7        Q. What's your name?
 8        A. Daniel Dror.
 9        Q. Are you a U.S. citizen?
10        A. Yes, sir.
11        Q. Naturalized?
12        A. Naturalized?
13        Q. Yes, sir.
14        A. What do you mean by that?
15        Q. Were you born in the U.S.?
16        A. No.
17        Q. Did you become a citizen after your birth?
18        A. Yes.
19        Q. When?
20        A. Approximately 20 years ago.
21        Q. Where did you live before you moved to the
22   States?
23        A. I lived in Brazil.
24        Q. Were you originally a Brazilian citizen?
25        A. Not originally.
```

### Page 5

```
 1        Q. Okay.
 2        A. But I was a Brazilian citizen.
 3        Q. Let's -- let's take it one at a time, then.
 4           What was your original citizenship?
 5        A. I was born in Israel.
 6        Q. All right. And how long were you there?
 7        A. I was there until I was about 12, 13 years
 8   old.
 9        Q. And then you moved where?
10        A. We moved to Sao Paulo, Brazil.
11        Q. Were you an Israeli citizen, until you moved
12   to Brazil?
13        A. Yes, sir.
14        Q. And when did you become a Brazilian citizen?
15        A. Probably a few years later.
16        Q. And were you a Brazilian citizen, until you
17   became a U.S. citizen?
18        A. That's correct.
19        Q. Did you work in Brazil?
20        A. I was working in Brazil, but just not full
21   time. I was still young, and I was, like, working
22   some part time, and doing different jobs, but,
23   primarily, playing the violin.
24        Q. I may have misunderstood you.
25           I thought that you moved to the U.S.
```

2 (Pages 2 to 5)

Page 38

1  International. True?
2  A. He did not have a base salary of that -- that
3  amount.
4  Q. Where do you currently live, sir?
5  A. I live at 1412 North Boulevard.
6  Q. How long have you lived there?
7  A. I've lived there for 30-some-odd years.
8  Q. You've continuously occupied that residence
9  as your primary residence. True?
10 A. As my primary residence, not -- not as my
11 primary residence all these years.
12 Q. Okay. When was 1412 North Boulevard not your
13 primary residence?
14 A. There was a period that I had -- that I lived
15 in New York, and I was considered that location,
16 because I was spending more time there.
17        And then there was a time that I was
18 living at a time in Florida, and it was -- at the
19 time I was in Florida, probably, I was considering
20 that the -- the North Boulevard was -- was my
21 residence.
22 Q. When did you live in New York?
23 A. I lived in New York in 19 -- when -- you're
24 asking for the period that I had the place in
25 New York?

Page 39

1  Q. Yes, sir. Yes, sir.
2  A. Was probably 1977 to 1984, '85.
3  Q. You continuously lived in New York?
4  A. Pretty much. I would come to Houston, but,
5  primarily, I would consider that I was living in New
6  York.
7  Q. Okay. In 1977 through 1984, who was
8  continuously occupying 1412 North Boulevard?
9  A. I'm trying to remember. My ex-wife, Barbara,
10 who passed away, this was Daniel's mother, she
11 occupied it, and Daniel occupied it, also. He was
12 living there.
13 Q. So while your ex-wife was living there, you
14 were not living there. True?
15 A. Well, I was living there periodically, but, I
16 mean, like, I was not -- I was considering New York
17 primarily that I was mostly in New York.
18 Q. I understand.
19      After you and your wife -- your ex-wife
20 divorced, where did you live?
21 A. I lived in -- I lived here, after that, in
22 '84.
23 Q. Okay.
24 A. But there was a period from '87 to '84, I'm
25 talking about.

Page 40

1  Q. I see. I misunderstood.
2     When were you divorced from --
3  A. '84.
4  Q. Franzheim was her maiden name?
5  A. Barbara Franzheim, yes.
6  Q. No one lived at 1412, in the period 1977 to
7  1984, except Ms. Franzheim and Daniel Dror, II?
8  A. Correct.
9  Q. Did you get the house in the divorce?
10 A. No. When we got divorced, I bought -- I
11 bought her share -- I bought Barbara's share in the
12 house, and she kept the place in New York. In other
13 words, we -- we exchanged. She wanted to live in
14 New York, so she lived there, and she kept that
15 apartment there, and I bought her share of the house
16 here in Houston.
17 Q. And -- and you lived there?
18 A. And I lived there.
19 Q. In 1984, did Daniel Dror live with his
20 mother?
21 A. It is -- actually, he lived with me more than
22 he lived with his mother.
23 Q. Both places, though?
24 A. Both -- yeah.
25 Q. The last time you were the record owner of

Page 41

1  1412 was 1991. True?
2  A. 1991? I don't remember; a long time ago. I
3  was, at one point, there some -- around that time, I
4  was the owner of it.
5  Q. Around that time, you ceased to be the record
6  owner of it. True?
7  A. I don't remember. If you show me documents,
8  it may refresh my memory. I'll be glad to explain.
9  Q. Well, you know that for more than ten years,
10 you have not been the record owner of 1412. True?
11 A. The title has changed a couple of times. I'm
12 remembering that.
13 Q. Do you know what "record owner" means?
14 A. Yeah.
15 Q. And so my question is, for the last ten
16 years, you know that you have not been the record
17 owner of 1412. True?
18 A. I -- I don't remember the -- the exact date.
19 If you show me some documents to refresh my memory,
20 I'll be glad to -- to respond to them.
21      (Exhibit No. 87 was marked.)
22 Q. (BY MR. HARRELL) Mr. Dror, I'm going to show
23 you what's been marked as Exhibit 87, and ask you if
24 you can identify that, sir?
25 A. It is a Special Warranty Deed, dated the 13th

11 (Pages 38 to 41)

Page 42

1  day of June 1991.
2      Q. And it is a deed from you, as the grantor?
3      A. Yes.
4      Q. Correct?
5      A. Correct.
6      Q. To Daniel Dror, II, 1976 Trust.  True?
7      A. Yes.
8      Q. What is the Daniel Dror 1976 Trust?
9      A. The -- a 1976 Trust, to the best of my
10 recollection -- now, that's been a long time ago --
11 it was -- it was set up by Daniel's mother, for him,
12 in 1976, and it has a certain amount of assets at the
13 time, and also had a certain amount of cash.
14         And to the best of my recollection, I
15 owed money to the IRS at the time.  I had an IRS
16 obligation, and I didn't have any other way to borrow
17 money from banks or so forth, so I transferred the
18 property to -- to the -- to the Trust and received
19 the cash to pay the IRS.
20         That's the best of my recollection at
21 the time.
22      Q. How much cash did you receive?
23      A. I think, at the time, I owed
24 400-and-some-odd-thousand dollars.
25      Q. And you received 400-and-some-odd-thousand

Page 43

1  dollars?
2      A. To the best of my recollection, I think
3  that's the amount that it was at the time.  I
4  received the amount that I needed for -- for the --
5  for the IRS.
6      Q. Who was the trustee or trustees of the Trust,
7  in 1991?
8      A. In 1991, I think it was -- I think it was his
9  mother, or it may have been, at one time, in the very
10 beginning, it may have been my father, but I'm not --
11 I'm not sure.
12     Q. Well, why don't you look at Exhibit 87.  It
13 shows that it was conveyed to Nathan.
14     A. Yeah.
15     Q. And I -- I apologize.
16     A. Yeah, this was my father, Faiwuszewicz, at
17 that time, yeah.
18     Q. And that -- that was your name, until you
19 changed it.  Correct?
20     A. This is correct.
21     Q. When did your father pass away?
22     A. I think in '95.
23         (Brief discussion off the record.)
24     Q. (BY MR. HARRELL) Rebekah Schultz, is that the
25 same thing as Rebekah --

Page 44

1      A. Ruthstrom.
2      Q. -- Ruthstrom?
3      A. She got married twice, one to a Schultz, one
4  to a Ruthstrom, so...
5      Q. Okay.  And in -- so in 1991, she was working
6  for you at American International.  True?
7      A. Yes.  She was just -- I think, just about
8  that time that she -- she may have started.
9      Q. Was your ex-wife a trustee of the 1976 Trust,
10 in 1991?
11     A. I'm not sure.  I don't know.  Don't recall.
12 I think that she was, but I -- I don't recall.
13     Q. Did you pay any money on existing loans or
14 liens on 1412, after the conveyance?
15     A. I don't -- I don't understand.  Any liens?
16     Q. Okay.  Let me -- let me show you, again,
17 Exhibit 87.  Okay?
18         It is at the last sentence of the first
19 paragraph.  "Such conveyance is hereby made subject
20 to all the presently existing liens and encumbrances
21 on the property."
22     A. Yeah.  So that's probably what -- in other
23 words, it was -- it was deeded to them for a certain
24 amount of the equity and cash that I received, and
25 the Trust may have assumed the -- whatever balance of

Page 45

1  any mortgages at the time that were on the property.
2      Q. Well, do you know the difference between
3  "subject to" and "assuming"?
4          And if you don't, you don't.
5      A. Well, of course.  I mean -- well, my
6  understanding is that subject to, meaning that you're
7  taking it with whatever it has on it, but without
8  your personal liability on it, that it is strictly
9  secured by the property itself.
10         Assuming is when you assume the
11 responsibility for payment, regardless of the
12 security itself.  That's my understanding of it.
13     Q. Did you continue to make payments on the
14 mortgage, after this transfer?
15     A. I don't recall.
16     Q. Did you ever make any payments to the Daniel
17 Dror 1976 Trust?
18     A. Payments regarding this transaction?
19     Q. Yes, sir.  Yes, sir.
20     A. I don't recall.  I think that I received the
21 money, and that I conveyed the property at that point
22 to '76 Trust.  And I don't remember the moment of the
23 mortgage or -- or -- and I don't remember if I made
24 any payments.
25     Q. But you continued to live there.  True?

12 (Pages 42 to 45)

Oral Deposition of Daniel Dror

Page 166

1  warranty deed -- and I'm -- I'm just thinking why I
2  would have done it, not that I remember why I would
3  have -- why I did it. But it looks to me like, when
4  I see "General Warranty Deed," usually a trust or
5  property by a general warranty deed.
6         So, you know, to differentiate, to make
7  sure it is not, like, a transfer of some property to
8  somebody, I wrote over here, "Dror Life Estate," so I
9  would know that's what this document was talking
10 about.
11     Q. Who prepared this document?
12     A. This was prepared, I think, by Daniel's -- by
13 Daniel's attorney.
14     Q. Who was that?
15     A. I don't know who it was, but I -- I remember
16 that -- that Daniel wanted to make sure that it
17 was -- that it is -- that -- he had concerns about
18 the fact that I'm married to a younger woman, and
19 that we have a child. And he wanted to make sure,
20 since this was his primary residence, that he
21 considered his homestead, that in case something
22 happened to me, that he will not have any problem to
23 have a young wife that could get some attorney to
24 create also some problems. So he decided he wanted
25 to have it very clear that I had a life estate and

Page 167

1  Gabriela would -- see if I remember correct -- would
2  have -- let's see what it says here, "The
3  relationship will terminate one year after the death
4  of Dror," yeah. So that means that if something
5  happened to me, that she would have one year to
6  vacate the -- the residence of -- of Daniel.
7         MR. HARRELL: Object; nonresponsive.
8      Q. (BY MR. HARRELL) Did you have --
9      A. What is nonresponsive?
10     Q. You didn't answer my question.
11        But --
12     A. Yeah, okay.
13     Q. -- did you --
14     A. I didn't answer your question?
15     Q. Did you have any agreement with your son
16 about your occupancy, before Exhibit 78?
17     A. About my occupancy?
18     Q. Yes.
19     A. And discussing the document with him?
20     Q. Yes, sir.
21        Before -- before this Exhibit 78, did
22 you have any agreement about your occupancy of
23 1412 with your son?
24     A. I had a -- basically, an oral, sort of,
25 month-to-month agreement that -- that I -- as long as

Page 168

1  I pay the -- as long as I pay the mortgage and the
2  expenses, until some other things would -- would --
3  if change, like in the event of my demise, or in the
4  event of maybe some unforeseen event.
5      Q. And then what was going to happen?
6      A. I'm sorry?
7      Q. And then what was going to happen?
8      A. What do you mean, what's going to happen
9  after that?
10     Q. You're going to occupy it until some event,
11 like your demise, and then I said, "Then, what was
12 going to happen?"
13     A. Or it could have been in one or two months
14 that he could come in and say, "Dad, you know, leave.
15 I need my house. I got married. I want to have
16 children, and go somewhere else."
17     Q. And you would have jumped on that?
18     A. What's that?
19     Q. You would have agreed to that?
20     A. What do you mean do I -- if I agree to that?
21        I mean, at that time, if he would have
22 come with that kind of a request, I would have said
23 it depends on the circumstances. If he had -- the
24 conditions, I had the conditions to go and buy
25 another house or he would have been able to buy

Page 169

1  another house, we would have done whatever at the
2  time would have been the -- the thing to do.
3      Q. Well, in 2007, he had another house. True?
4      A. Another house?
5      Q. Yes, sir.
6      A. He never had another house.
7      Q. Did he have a condominium at the Huntington?
8      A. That condominium was like he was -- his
9  girlfriend lived around the corner, and he used it
10 most of the time. To the best of my knowledge, he
11 used it over there for his office and exercise rooms
12 and -- and board -- board meetings, had a -- had a
13 conference over there.
14        To me, that's what -- he did not have
15 another house, he did not own any other house.
16     Q. He owned a condominium?
17     A. No. He owned a condominium way, way after.
18     Q. Way after what?
19     A. In 2007?
20     Q. Yes, sir.
21     A. To the best of my knowledge, he didn't own a
22 condominium. Unless you -- maybe -- I don't remember
23 when he bought it, so if you'll refresh my memory
24 when he bought it.
25     Q. Well, he testified he bought it in 2007.

43 (Pages 166 to 169)

Oral Deposition of Daniel Dror

Page 226

1  I, DANIEL DROR, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
6
7  _____
            DANIEL DROR
8
   THE STATE OF TEXAS    )
9  COUNTY OF _____ )
10
11     Before me, _____, on this day
12 personally appeared DANIEL DROR, known to me (or
13 proved to me under oath or through
14 _____) (description of identity card or
15 other document) to be the person whose name is
16 subscribed to the foregoing instrument and
17 acknowledged to me that they executed the same for
18 the purposes and consideration therein expressed.
19     Given under my hand and seal of office this
20 _____ day of _____, 2012.
21
22
23  _____
         Notary Public in and for
24       the State of Texas
25

Page 227

1        CAUSE NO. 2010-27354
2  WELLS FARGO BANK, N.A., AS) IN THE DISTRICT COURT OF
   TRUSTEE FOR OPTION ONE    )
3  MORTGAGE LOAN TRUST       )
   2007-FXD1, ASSET-BACKED   )
4  CERTIFICATES, SERIES      )
   2007-FXD1, BY ITS         )
5  SERVICER-IN-FACT,         )
   SPECIALIZED LOAN          )
6  SERVICING, LLC,           )
       Plaintiff,            )
7                            )
   VS.                       ) 270TH JUDICIAL DISTRICT
8                            )
   BOULEVARD PROPERTIES      )
9  CORPORATION, DANIEL DROR, )
   II, DANIEL DROR, AND      )
10 GABRIELA KRKOSKOVA DROR,  )
       Defendants.           ) HARRIS COUNTY, TEXAS
11
12        REPORTER'S CERTIFICATION
13        DEPOSITION OF DANIEL DROR
14            SEPTEMBER 6, 2012
15
16     I, Yvette M. Perrodin, Certified Shorthand
17 Reporter in and for the State of Texas, hereby
18 certify to the following:
19     That the witness, DANIEL DROR, was duly sworn by
20 the officer and that the transcript of the oral
21 deposition is a true record of the testimony given by
22 the witness;
23     That the deposition transcript was submitted on
24 _____ to the witness or to the attorney
25 for the witness for examination, signature and return

Page 228

1  to me by _____, 2012.
2     That the amount of time used by each party at the
3  deposition is as follows:
4  MR. C. ED HARRELL  (4 Hours, 26 Minutes)
5  MR. NEAL D. CANNON, JR.  (6 Minutes)
6  MR. LEONARD H. SIMON  (0 Minutes)
7     That pursuant to information given to the
8  deposition officer at the time said testimony was
9  taken, the following includes counsel for all parties
10 of record:
11    Mr. C. Ed Harrell, Counsel for
12 Plaintiff/Counter-Defendant Wells Fargo, Trustee
13    Mr. Neal D. Cannon, Jr.  Counsel for Defendant
14 Daniel Dror II, Daniel Dror and Gabriela Krkoskova
15 Dror
16    Mr. Leonard H. Simon, Counsel for Defendant
17 Boulevard Properties Corporation
18    I further certify that I am neither counsel for,
19 related to, nor employed by any of the parties or
20 attorneys in the action in which this proceeding was
21 taken; and further, that I am not financially or
22 otherwise interested in the outcome of the action.
23    Further certification requirements pursuant to
24 Rule 203 of TRCP will be certified to after they have
25 occurred.

Page 229

1  Certified to by me this _____ day of
2  _____, 2012.
3
4
5  _____
6  Yvette M. Perrodin, CSR #8122
   CSR Expiration: 12-31-2013
   Liberty Litigation Support
7  7171 Highway 6 N., Suite 200
   Houston, Texas 77095
8  Phone:  (832) 427-5460
   Fax:    (713) 533-8997
9  Firm Registration No. 708